## Wytheville.

## TURNER V. MONTEIRO AND OTHERS.

June 10, 1920.

Absent, Sims, J.

1. RULE IN SHELLEY'S CASE—*Statement of the Rule.*—Whenever the ancestor, by any will, gift, or conveyance, takes an estate of freehold in lands, or tenements, and in the same will, gift, or conveyance, an estate is afterwards limited by way of remainder, either mediately or immediately, to his heirs, or to the heirs of his body, the words "heirs," or "heirs of the body," are words of limitation of the estate, carrying the inheritance to the ancestor, and not words of purchase creating a contingent remainder in the heirs.

2. "DESCENDANTS"—*Whether Technical Word.*—While the word "descendants" is not a technical word to the extent that the law has not impressed it with a different meaning from that accorded in common acceptation and general understanding, it is a word much used in law and of very clear and definite meaning.

3. "DESCENDANTS"—*Meaning of the Term—Distinguished from Child—Synonymous with Issue.*—A descendant is an individual proceeding from an ancestor in any degree. It is synonymous with issue. It is offspring, near or remote. The word "child" is not synonymous with the word "descendant," though a child is a descendant and a descendant may be a child; but a descendant may also proceed from an ancestor in the remotest as well as the nearest degree. Obviously, this is not true as to a child.

4. RULE IN SHELLEY'S CASE—*Class of Persons to Take Indefinitely in Succession.*—It is a part of the rule in *Shelley's Case* and essential to its operation, that the words used to indicate the persons to whom the estate is limited, by way of remainder, must import a class of persons to take indefinitely in succession. If they do import such a class, then the rule is of inflexible application; but if the words are used to designate particular individuals, the words so used are words of

68

purchase and not of limitation, *e. g.*, grant to A. for life, remainder to the heirs of A. now living, or remainder to the sons of A. and their heirs, or remainder to the children of A. In all of these instances, particular individuals are indicated by the words used; hence the rule does not apply.

5. RULE IN SHELLEY'S CASE—*"Descendants"—"Heirs of the Body"—Superadded Words.*—The rule in *Shelley's Case* applies when the limitation in remainder is to the "heirs of the body" of the tenant of the freehold. The words "descendants" and "heirs of the body" are of equivalent meaning. It is, of course, essential to the application of the rule that the word or words used in the limitation over import a class of persons to take indefinitely in succession. Any words of superadded limitation, showing that the words used are intended to designate particular persons, will defeat the rule.

6. RULE IN SHELLEY'S CASE—*Rule of Law not a Construction.*—The rule in *Shelley's Case,* where the requisites concur, controls the intention of the testator, or grantor, and overrides his purpose, often very clearly expressed, to limit the ancestor to an estate of freehold. The rule is not a means to discover the intent of the grantor, or testator, but, supposing the intent ascertained, the rule controls it.

7. RULE IN SHELLEY'S CASE—*Descendants—Case at Bar.*—Under a will which took effect before the abolition of the rule in *Shelley's Case,* a testator gave land to two of his sons during their lifetime to hold jointly and after the death of the last of the two to their descendants, if they have any; if not, to a third party or his descendants.

   *Held:* That by force of this rule in *Shelley's Case* the two sons took an estate tail, which, by operation of the statute, then as now in force, was converted into a joint fee.

8. WILLS—*"Descendants"—"Children"—Case at Bar.*—In the instant case the Supreme Court of Appeals was unable to find in the will any qualifying words, or sentences, or words of superadded limitation, justifying the conclusion that the testator used the word "descendants" with the meaning of children. The passages of the will cited in support of that conclusion were too vague, uncertain, and conjectural to justify the conclusion that a testator who used both words "descendants" and "children" in his will, used the former when he really meant the latter.

9. RULE IN SHELLEY'S CASE—*Joint Limitation.*—Where the joint limitation of the freehold to several is followed by a joint limitation to the heirs of the same parties, the rule applies—*e. g.,* grant to A and B for their joint lives, remainder to C. for life,

remainder to the heirs of A and B. Here both limitations being of the same quality, that is, both joint, the fee vests in the ancestors jointly.

Appeal from a decree of the Circuit Court of Goochland county. Decree for complainant. Defendants appeal.

*Reversed.*

The opinion states the case.

*S. A. Anderson* and *David Meade White,* for the appellant.

*Lassiter & Drewry,* for the appellees.

SAUNDERS, J., delivered the opinion of the court.

This appeal brings before us for interpretation the will of Francisco X. Monteiro. This will was probated in Goochland County Court, February 18, 1849, and is in terms as follows:

"I, F. X. Monteiro, of the county of Goochland, being desirous to dispose of my estate do hereby make my last will and testament in manner and form following, that is to say: I do hereby constitute and appoint my two sons, Henry and Aristides, executors of this my last will, and give to them during their lifetime the land I own and all the stock and farming utensils, and slaves except Dolly and her children, to hold it jointly and after the death of the last of the two to their descendants, if they have any, if not to my son Archimides or his descendants, I give the above mentioned property without restriction. To my daughter, Emilia, I give during her life the dividends on all the bank stock I may own at the time of my death, of which she will give the fourth part to her brother, Archimides, yearly; and also give the use of the woman Dolly

and her children. After her death my son, Archimides, will have this woman and her offsprings and one-half of the bank stock, and the other half will go to my executors, or their descendants. I had four other sons that have parted with me at different times; if they be alive and call within three years after my death, my executors will give to Alicides and Miltiades one hundred dollars each, to Frances and Edward, ten dollars each. The balance of my property must be used in community, or friendly divided between my executors, my daughter, Emilia, and my son, Archimides, or any of them that be alive, and qualified to receive it at the time of my death. It is my desire that these four last mentioned children of mine substitute one another in all events, that I cannot foresee so that the main part of my property may not pass out of them or their descendants while it be lawful and possible. My executors shall not be obliged to give security to execute this my last will, neither to make inventory or have the property appraised. They are requested to order no funeral ceremonies after my death. The present will is wholly written by my own hand. In witness whereof, I have hereunto set my hand and affixed my seal, this first day of April, in the year one thousand eight hundred and forty-eight.

"F. X. MONTEIRO."

A few years after the will was probated, apparently under the impression that the first paragraph of the same lodged in them a joint fee in the land devised, the devisees, Henry and Aristides, made a partition of this land, Aristides taking a tract of 313 acres and a piece of woodland adjoining, containing about fifteen acres, and Henry taking a tract of 343 acres. The tract taken by Aristides is known as "Monterey," and that taken by Henry as "Montrose." The deed effecting this partition was duly acknowledged

by the two brothers in the Goochland County Court on November 15, 1852, and on the same day ordered to be recorded.

In the year 1870, for some reason which cannot now be ascertained, Aristides Monteiro, as guardian for his infant children, and in his own right, brought a suit against said infants, the infant children of his brother, Henry X. Monteiro, his brother Archimides Monteiro, and sister Emilia Monteiro. The papers of this suit have been lost, and nothing in connection therewith can be located, save a decree entered in the suit on April 6, 1870. This decree is as follows:

"This cause coming on to be heard on the bill and exhibits filed, the answers of the adult defendants, Archimides Monteiro and Emilia Monteiro, the answers of the infant defendants, Clarence E. Monteiro, Frank Monteiro, Moses T. Monteiro and Henry G. Monteiro, who are over fourteen years old in their proper persons, and the deposition of a witness was argued by counsel. On consideration whereof, the court being satisfied from the proof that the interests of the parties will be promoted by a sale of the 313 acres of land in the bill mentioned, doth adjudge, order and decree that Aristides Monteiro, who is hereby appointed a commissioner for the purpose, do after advertising the time and place of sale once a week for four weeks in some newspaper published in the city of Richmond, and by notice posted at the door of the courthouse of Goochland county, on some court day preceding the day of sale and at two or more public places in the neighborhood of the land, do proceed to sell at public auction to the highest bidder upon the premises the said tract of land upon the following terms, that is to say, for cash enough to pay the cost of this suit and the expenses of sale, and as to the residue upon a credit of one, two, three and four years for bonds on equal instalments bearing interest from date and secured by a good

personal security and retaining the title until the whole of the purchase money is paid. But if the said commissioner shall find that he make a desirable private sale, he is authorized to do so with such change of the above terms as he may find desirable. And report the same to this court and out of any money he may receive, the said commissioner shall pay the costs of this suit and expenses of sale.

"And he shall make full report to this court of his proceedings and return any bonds taken by him and his vouchers for disbursements. And the said commissioner shall receive no money under any sale he may make until he shall have given bond before the clerk of this court in his office, a bond with good security conditioned according to law in a penalty of at least double the amount of money so received."

In May, 1882, Aristides Monteiro conveyed to Charles W. Turner the tract known as Monterey, which had been conveyed to him in the partition deed, cited *supra.* By deed dated October 31, 1893, Charles Turner conveyed Monterey to his wife, Mollie A. Turner, who is the appellant in these proceedings.

The place known as Montrose, or at least so much as was left of it, was partitioned in January, 1906, between the parties then owning it, to-wit: Robert H. Monteiro, Charles F. Monteiro and Fanny Monteiro, who are the children of Frank X. Monteiro and grandchildren of Henry X. Monteiro, the son of the testator, Francisco X. Monteiro. In 1914, Charles F. Monteiro, who had acquired by inheritance, or purchase, various interests in Montrose, brought a suit against the descendants of Francisco X. Monteiro, Mollie A. Turner and others, alleging that his title to his interests in Montrose had been questioned, and asking that the will of Francisco Monteiro be construed, and the exact estates in the land passing by his will be ascertained and established. Mollie A. Turner filed a separate answer to this bill, setting

up title to Monterey on the ground that Henry X. Monteiro and Aristides took a joint fee in the lands devised by Francisco X. Monteiro, and that she in regular course of devolution of title had become the owner of that portion of the said lands which in the partition between Henry X. Monteiro and Aristides Monteiro had been conveyed to the said Aristides. As a further ground of defense she alleged that the children of Aristides Monteiro were estopped from setting up any sort of claim of interest in Monterey by reason of the suit of Aristides Monteiro, cited *supra,* to which they were alleged to have been parties.

· Upon the issues presented, the Circuit Court of Goochland county held that under the will of Francisco Monteiro, his sons, Aristides and Henry, took a "life estate only in the land devised, with a contingent remainder over in fee in the descendants of said first takers, jointly, and that the word 'descendants,' in said will, was not used in the technical sense, as a word of inheritance, but described the persons to take, if any, at the time of the death of the survivor of the two life tenants." To this finding of the court, on the application of Mrs. Mollie A. Turner, an appeal and supersedeas were allowed by one of the judges of this court.

The clause of the will of Francisco Monteiro necessary to be construed to determine the estate taken by his sons, Aristides and Henry, is the following:          .

"I do hereby constitute and appoint my two sons, Henry and Aristides, executors of this my last will, and give to them during their lifetime the land I own, with all the stock and farming utensils and slaves, except Dolly and her children, to hold it jointly, and after the death of the last of the two, to their descendants, if they have any, if not to my son, Archimides, or his descendants, I give the above mentioned property without restriction."

[1] This case was very elaborately and ably argued, and much authority was cited to support, on the one hand,

and repel on the other, the pivotal contention, that the rule in *Shelley's Case*, which was in force in this State at the time that the will of the ancestor took effect, determines the character and extent of the respective interests of the sons, Aristides and Henry X. Monteiro, in the land devised by the testator. The precise terms of this rule will be stated in this connection: "Whenever the ancestor by any will, gift, or conveyance, takes an estate of freehold in lands, or tenements, and in the same will, gift, or conveyance, an estate is afterwards limited by way of remainder, either mediately or immediately to his heirs, or to the heirs of his body, the words 'heirs,' or 'heirs of the body,' are words of limitation of the estate, carrying the inheritance to the ancestor, and not words of purchase creating a contingent remainder in the heirs." 2 Minor's Inst. (4th ed.), p. 401.

It is plain enough that Henry and Aristides take an estate of freehold in the land passing by the will. It is equally plain that an estate by way of remainder is immediately limited to the descendants of the tenants of the freehold. So far, there are no difficulties. But is the word "descendants," as used by the testator, a word of limitation carrying the inheritance to the ancestors, or is it a word of purchase, creating a contingent remainder in the descendants?

[2-4] It is earnestly insisted that the word "descendants" is not a technical word. That is true to the extent that the law has not impressed it with a different meaning from that accorded in common acceptation and general understanding. But it is a word much used in law and of very clear and definite meaning. A descendant is an individual proceeding from an ancestor in any degree. It is synonymous with issue. It is offspring, near or remote. The word "child" is not synonymous with the word "descendant," though a child is a descendant and a descendant may be a child; but a descendant may also proceed from

an ancestor in the remotest as well as the nearest degree. Obviously, this is not true as to a child.   It is a part of the rule in *Shelley's Case,* and essential to its operation, that the words used to indicate the persons to whom the estate is limited, by way of remainder, must import a class of persons to take indefinitely in succession.   If they do import such a class, then the rule is of inflexible application; but if the words are used to designate particular individuals, the words so used are words of purchase and not of limitation—*e. g.,* grant to A for life, remainder to the heirs of A now living; or remainder to the sons of A and their heirs; or remainder to the children of A.   In all of these instances, particular individuals are indicated by the words used; hence, the rule does not apply.

In the brief for H. L. Monteiro and associate appellees, it is insisted that the testator used the word "descendants" in the sense of children of the first takers.   Aid for this contention is sought, and considered to be found, in the will as a whole, and in the context of the word "descendants." The argument of the brief on this point is of interest in this connection: "Is it not evident that it was the testator's intention to give his lands to his sons, Henry and Aristides, 'during their lifetime,' with remainder to the survivor, and after the death of the last of the two, to their descendants (or children) if they have any?   The testator expressly desired that the main part of his property may not pass out of them or their 'descendants,' while it is lawful and possible.   Is it not apparent that he used the word 'descendants' of Henry and Aristides in the sense of children of the first takers, when he further provides that if they have no descendants (children) living at the death of the survivor of the two, the property should go to Archimides, or his descendants, without restrictions?   In order to make the rule in *Shelley's Case* apply to this devise, it would be necessary to give the word descendants the technical meaning of

'heirs.' But if we construe the word descendants to mean heirs, in this will, we overlook the fact that the testator had four other sons besides Henry, Archimides and Aristides. It is conceivable that these four, or some one of them, or more of them, might have answered to the description of 'heirs' of Henry and Aristides. But the testator 'cut them off with a shilling.' Evidently he had in mind the 'children' of the first takers living at the time of the death of the survivor. He did not wish the main part of his estate to pass out of the first takers and their children, 'while it be lawful and possible.' This word was a designation, or description of particular persons, and consequently is a word of purchase which carries the estate to the children, and not a word of limitation carrying the inheritance to the ancestors. The intention of the testator made manifest by the will itself, being the polar star which is to guide our decision, there is no escape from the conclusion that the will under consideration created an estate for life in Henry and Aristides, followed by a remainder on a double contingency."

After careful consideration of the passages cited from the testator's will in support of the contention that he used the word "descendants" intending to signify children, the court is unable to derive much assistance therefrom in its effort to ascertain the testator's intention. The words, "I give the above mentioned property without restriction," which conclude the first sentence of the will, may refer as well to the testator's provision for Aristides and Henry and their descendants as to the remainder, "to Archimides or his descendants." But in either event, whether it was intended to apply to the three brothers and their descendants, or exclusively to Archimides and his descendants, the meaning of these words is utterly obscure, and affords no indication whatever that the testator used the word "descendants" as synonymous with the word "children." The expression of the testator's desire that the main part of his property

should not pass out of the four children mentioned, or their descendants, "while it be lawful and possible," indicates that the testator was looking to a possibly remote future when he used the word "descendants," in preference to the word "children," a word that, if used, would have left the situation entirely free of difficulty. Indeed the question may well be asked in this connection: Why did the testator select the word "descendants" to express his intention, if he really had in mind "children"? He very well understood the use and meaning of the latter word, for he uses it in his will several times, in its ordinary acceptation. If he intended his real estate to go to their "children" at the death of the last of the two first takers, as is contended, why did he becloud that intention, to no purpose and for no alleged or conceivable reason, by the use of the word "descendants"? A person who has in mind "children" and "children" only, is likely to say "children," in preference to using a word which embraces issue to the remotest degree. In order that the word "descendants" may be treated as a word of purchase, carrying the estate to the children, the court must conclude on the whole, and derive that conclusion from the words used in the will, that the testator used the word as a designation, or description of particular persons, to-wit, to children of his sons Aristides and Henry, and not intending that the persons who are to take after the death of the ancestors are to be their offspring in indefinite succession.

[5] In determining whether the rule in *Shelley's Case* applies to the instant case, it is not necessary to give the word "descendants" the technical meaning of "heirs," which is a word of the broadest signification in law. The rule in *Shelley's Case* applies when the limitation in remainder is to the "heirs of the body" of the tenant of the freehold. The words "descendants" and "heirs of the body" are of equivalent meaning. It is of course essential to the application of the rule that the word or words used in the

limitation over import a class of persons to take indefinitely in succession. Any words of superadded limitation, showing that the words used are intended to designate particular persons, will defeat the rule. In respect of the application of the rule to wills, Mr. Minor says:

"There seems to be no essential difference in the application of the rule to wills and to deeds * * *. Where the estate is so given that, after the limitation of the freehold to the ancestor, it is to go to every person who can claim as heir of the ancestor, the word heirs must be a word of limitation. That is, if the limitation to the heirs is so calculated, and directed, that the person claiming under it must entitle himself merely under the description of heir to the first taker, in the technical sense of the word, and if there is nothing to restrain the same words from equally extending to and comprehending all other persons necessarily answering the same description, or from entitling them alike under it, *eo nomine* only, then whether the limitation is contained in a deed or a will, the rule applies, and the ancestor takes an estate of inheritance." 2 Minor's Inst. (4th ed.), p. 408.

The principles announced in the paragraph cited may be readily applied to the will under consideration. The land conveyed to the ancestors in the instant case is to go after their death to every person who can claim as a "descendant" of the ancestor. Hence, the word "descendant" is a word of limitation in the contemplation of the law. The limitation in this will is so calculated and directed that a person claiming under it need entitle himself merely under the description of "descendant" of the first taker. There is nothing to restrain the word used from equally extending to and comprehending all other persons answering the description of "descendant," or from entitling them alike under it and *eo nomine* only.

[6] The rule in *Shelley's Case,* where the requisites con-

cur, controls the intention of the testator, or grantor, and overrides his purpose, often very clearly expressed, to limit the ancestor to an estate of freehold. As stated by Mr. Minor, the rule is not a means to discover the intent of the grantor, or testator, but supposing the intent ascertained, the rule controls it. 2 Min. Inst. (4th ed.), p. 402. But, as pointed out, the rule does not apply unless the words of limitation over include the whole line of possible recipients in indefinite succession. If the word "descendants" is interpreted as the words "heirs of his body," or "issue," have been interpreted, it includes the posterity of Aristides in indefinite succession. In that event, it is immaterial that the testator intended to limit the ancestor to a life estate, for the law, operating through the rule in *Shelley's Case,* takes charge of the situation, and carries the inheritance to the ancestor. The meaning of the word "descendants," as given by the Century Dictionary, has been cited. The same meaning is given to it in law.

"The word 'descendants' comprises issue of every degree." *Neilson* v. *Brett,* 99 Va. 677, 40 S. E. 32.

"Descendants in a will are equivalent to heirs of the body." Minor on Real Property, Vol. 1, p. 837.

"Descendants are issue of every degree." 2 Jarman on Wills (5th ed.), pp. 98, 101.

See also 13 Cyc., p. 1048, which defines "descendant," as an heir in the direct descending line, issue of the body.

In one case at least it has been held that "descendant" does not mean child. See 13 Cyc., p. 1048, note, in which the following ruling is cited: "In this case there is what appears to me to be a perfectly unambiguous word 'descendants'—a word which I venture to say no layman or lawyer would use to designate children *only* (italics supplied), and it is difficult to conceive any context by which the word 'descendants' could be limited to mean children only."

There are various decisions in the Virginia precedents in

which the language of instruments construed was substantially the same as that used by Francisco X. Monteiro in the will under consideration.    In the case of *Moore* v. *Brooks,* 12 Gratt. (53 Va.) 135, the testator used the following language: "At the death, or intermarriage, of my dear wife, it is my will that my then remaining estate be subject to equal distribution between all of my children; and it is my express desire that the parts of my estate which shall go to my daughters, Mary Murphy and Caroline Brooks, shall be held by them during their natural lives, and *no longer* (italics supplied), and then equally divided between their heirs lawfully begotten."    The court held that the rule in *Shelley's Case* gave the inheritance to Mary Murphy and Caroline Brooks, in their respective shares of the estate, in spite of the clearly expressed intent of the testator that their interests should terminate at their respective deaths.

In *King* v. *Johnson,* 117 Va. 49, 83 S. E. 1070, the following provision is found in the will of Thomas King: "I give to my son, Rufus, all of my real estate in the county of Westmoreland, for and during his natural life, and should he die with a lawful heir, to his heir or heirs forever.    But should he die without issue, I give the land to my son, Alexander King, to him and his heirs forever."    Rufus King died leaving several children who claimed the inheritance.    This court, Buchanan, J., delivering the opinion, said: "That if the will had been executed since the doctrine known as the rule in *Shelley's Case* was abolished, there would be no question that Rufus King took only a life estate in the land, but as the devise was made in 1845, or 1846, before the abolition of the rule, its meaning must be determined by the law as it then existed."    After stating the terms of the rule and certain fundamental principles of construction, the court concluded as follows:    "Applying this rule of construction to the devise under consideration, there is nothing in the will which *plainly shows* (italics supplied) that the words

'his heirs,' or 'heirs forever,' were used in any other than their technical sense. This being so, it is clear that the devise in question comes within the rule in *Shelley's Case,* and that Rufus King took a fee simple estate in the land." 117 Va. p. 53, 83 S. E. 1071. With a little change in wording, in no wise altering its legal effect or meaning, the will of Francisco Monteiro would practically be the counterpart of the will of Thomas King. Making these changes, the will in the instant case would read as follows: "I give all my land to my sons, Aristides and Henry, for and during their natural lives, and after the death of the last of the two, should they die with lawful descendants (*i. e.,* issue, or heirs of the body), to such descendants. But should they die without descendants (issue), I give the said land to my son Archimides, or his descendants (*i. e.,* issue, or heirs of his body)."

In *Hall* v. *Smith,* 25 Gratt. (66 Va.) 70, the following extract from the will of the testator will be found on p. 71: "I lend to my daughter Mary C. her portion during her life, and after her death I give the same to the lawful issue of her body, to them and their heirs and assigns forever." The court held that Mary C. took an estate tail in the realty, under the rule in *Shelley's Case.*

The case of *Stokes* v. *VanWyck,* which seems to be precisely in point, will be found in 83 Va. 724, 3 S. E. 387. In that case the court construed the sixth clause of the will of William Boush, which was as follows: "I give and bequeath to my daughter, Elizabeth Jacomine Walke and her husband, David M. Walke, during their joint lives, and to the survivor of them during the life of such survivor" (this was the same provision made by Francisco Monteiro for his sons, Aristides and Henry) "the land and plantation on which I now live; and if my daughter should die leaving issue, at her death, I give the said land after the termination of the life estate aforesaid to such issue, and to his, her, or their

heirs forever; but if my said daughter should die without leaving such issue, then my will is that after the death of my son-in-law, David Walke, the said land should pass and descend to my heirs according to the laws of descent in Virginia, and their heirs forever." This will was probated in February, 1834. The parallelism between the terms of the devise in this case and those in the instant case will be noted. The court held that the rule in *Shelley's Case* operated upon the disposition of the real estate devised in the will to Mrs. Walke, and her husband, for their lives, to create an estate tail in Mrs. Walke." 83 Va. p. 730, 3 S. E. 387. This estate tail the statute converted and enlarged into a fee simple.

[7, 8] The instant case must be decided according to the law in force in 1846. At that time the rule in *Shelley's Case* operated, and then, as now, the statute was in force which converts an estate tail into a fee simple. The court is satisfied, after full consideration of the precedents, that this case falls within the above rule. We are unable to find in the will, either in the first paragraph, or in any other paragraph, any qualifying words, or sentences, or words of superadded limitation, justifying the conclusion that the testator used the word "descendants" with intent to designate the children of his sons, Aristides, Henry and Archimides. The passages of the will cited in support of that conclusion are too vague, uncertain and conjectural to justify the conclusion that a testator who used both words, "descendants" and "children" in his will, used the former when he really meant the latter. Giving the word actually used the same meaning that would be given the word "issue," or "heirs of the body," in the same connection, it is plain that under the operation of the rule in *Shelley's Case*, Aristides and Henry X. Monteiro took a joint fee in the land devised. By virtue of the subsequent partition, Aristides became seized in fee of "Monterey" and Henry of "Montrose."

[9] One further contention of appellees' brief will be dis-

posed of in this connection.    This is the contention that the rule in *Shelley's Case* does not apply in the case under consideration, for the reason that the gift in this case was not to an ancestor and the heirs of his body, as the rule requires, but to two ancestors, to hold jointly, to the survivor to hold severally, and upon the death of the last of the two to the heirs of *their* bodies.    Hence, the brief concludes, "this is the case of a grant to A for life, with remainder to the heirs of A and B."    If this is a case of that character, it is conceded that the rule does not apply.    In response to this contention it suffices to make one quotation from Mr. Minor, as follows:

"Where the joint limitation of the freehold to several is followed by a joint limitation to the heirs of the same parties, the rule applies—*e. g.*, grant to A and B for their joint lives, remainder to C for life, remainder to the heirs of A and B.    Here both limitations being of the same quality, that is both joint, the fee vests in the ancestors jointly."    2 Minor's Inst. (4th ed.), p. 405.

Having reached the conclusion announced, it is unnecessary to consider the contentions of the appellant with reference to the effect to be given to the proceedings in the suit of *Aristides Monteiro* v. *Archimides Monteiro and others,* cited *supra.*

For the reasons heretofore given, it is considered that the decree of June 10, 1918, of the Circuit Court of Goochland county should be reversed, and this court will enter the decree proper to have been entered in the first instance.

*Reversed.*